FILED
CLERK, U.S. DISTRICT COURT
FEB 25 2020
CENTRAL DISTRICT OF CALIFORNIA
BY ____ DEPUTY

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. ANNA SHAPIRO, <br><br> Annas, <br> vs. <br><br> FAIRFAX DISCOUNT PHARMACY, INC. <br><br> Defendant. | Case No.: 2:18-cv-04888-SVW-GJS <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

1

## I. Introduction

Anna Shapiro ("Anna") is the caregiver to her two elderly parents, Nonna Shapiro ("Nonna") and Mark Shapiro ("Mark") together ("Parents" or "Shapiros"). Anna claims she spends roughly eight hours per day with her Parents, helping take care of household tasks and administering their medications. Anna has been paid caretaker for her Parents through the California Department of Social Services since 2005, and Anna claims she knows all of the medications her Parents are prescribed. Around September of 2016, Anna attempted to purchase life insurance for her Parents, but in February of 2017, Anna received notice from the insurance company that her Parents were denied because they were prescribed the memory loss drug Namenda. Fairfax Discount Pharmacy, Inc. ("Fairfax" or "Defendant") is a high-volume discount pharmacy which serves primarily Russian-speaking patients who are on Medicare. Defendant testified that Fairfax has around 500 regular customers and disperses thousands of prescriptions per month. Fairfax was the Parents' exclusive prescription provider between 2010–17, and Fairfax records revealed both Parents had received prescription disbursements of a memory-loss treatment drug named Namenda during that time. Anna claims that Fairfax defrauded Medicare by billing for Namenda but never delivering it to her Parents.

Anna brought a qui tam action as a relator against Fairfax in 2017 under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, but the government declined to intervene. She began this civil complaint on June 1, 2018, alleging that Fairfax fraudulently billed Medicare for Namenda that was never prescribed or disbursed to her Parents. On January 23, 2019, the Court granted a stipulation to file a First Amended Complaint, which was filed January 24, 2019. Defendants filed a motion to dismiss on February 22, 2019, which was granted on April 26, 2019. Finally, a Second Amended Complaint was filed May 29, 2019, and the motion to dismiss was denied on September 6, 2019. The Parties stipulated to a bench trial to begin February 4, 2020.

During discovery, when Anna discovered that Namenda had actually been authorized to her Parents by Dr. Rachman, Anna continued to pursue her FCA claim on the theory that the Namenda ordered by Dr. Rachman was never disbursed by Fairfax to the Parents. Alternatively,

2

Anna suggested a fraudulent scheme wherein Dr. Rachman wrote prescriptions for medications not needed by the patients, and submitted those prescriptions to Fairfax, who would in turn bill Medicare for the prescription but never deliver it to the patient. There was no dispute that Fairfax had billed the Shapiros' Prescription Benefit Manager ("PBM"), Silver Script, for Namenda. Since Silver Script is eventually paid by Medicare, a fraudulent billing to Silver Script could potentially results in FCA liability. A bench trial was held in the United States District Court in Los Angeles from February 4–5, 2020. As a result of that bench trial, the Court submits these findings of fact and conclusions of law.

## II. Findings of Fact

For all findings of fact set forth below, in making any credibility determinations regarding witness testimony, the Court has considered, among other things, the manner in which the witnesses testified, their interest in the outcome of the case, and the reasonableness of their testimony in light of all of the evidence. The Court has also considered the relevant factors in Section 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017 Edition), located at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2018_9_0.pdf.

### A. Relator's Direct Evidence

The essential allegation of this case was that the disputed drug, Namenda, was never in any of the bags of prescriptions delivered to the Parents by Fairfax. Over the course of more than ten years, the Shapiros undisputedly received regular deliveries of their other prescriptions from Fairfax—sometimes over twelve prescriptions per month. These deliveries were never contested. To establish that no Namenda was ever delivered, Anna provided three direct witnesses: herself, Nonna Shapiro, and Mark Shapiro. Each of the three witnesses testified that they never saw bottle of Namenda in the Shapiros' prescriptions. For the reasons provided below, however, the Court does not credit their testimony.

#### 1. Mark Shapiro

Mark Shapiro testified that he was the person who most frequently accepted the bag of prescriptions from the Fairfax delivery driver—although his wife collected the bag on at least a

3

few occasions. Fairfax would deliver prescriptions directly to its patients using a delivery driver—primarily a man named Yuri Bon, who testified at the trial. Bon testified he would collect a stapled-shut bag of prescriptions from the pharmacy counter at Fairfax and deliver it directly to the patients. The bag had a label attached which listed every medication that was supposed to be inside, and each medication label had a signature line beneath it. Bon testified that although most patients signed for their prescriptions, Mark Shapiro would simply grab the bag and walk away without exchanging any words. Both Mark Shapiro and Yuri Bon testified that Mark never signed for the prescriptions. Yuri Bon later testified that he would write Mark and Nonna Shapiro's signatures on the signature line because neither of the Parents would ever sign the papers, even if asked.

Mark Shapiro's signature is not especially relevant, however, as it was undisputed that Mark does not speak or read any English and that all of the pharmacy writing (including the delivery labels and writing on the prescription bottles) is exclusively in English. Even if he had examined the bag upon arrival, Mark would be unable to identify which prescriptions were actually in the bag, and his signature would simply have been a pro forma acknowledgement of a delivery of unknown prescriptions, which was not disputed at trial.

Mark also testified that he knew why he was taking most of his medicines, but he did not know their names nor could he read the labels on the bottles to verify which prescriptions were which. Although the Court has no reason to doubt the candor of Mark Shapiro as a witness, his testimony does nothing to advance Anna's case because he had no actual knowledge of the medications he received from Fairfax and no direct knowledge of the names of which drugs he actually took on a daily basis.

2. Nonna Shapiro

Nonna Shapiro also testified, but her testimony was inconsistent—both internally and with the other evidence in this case. Nonna testified that she was able to read and understand English, and that she kept track of both the prescriptions that she received and those that were billed to her insurance. Nonna testified that she never received a bottle of Namenda from Fairfax, nor had she or her husband ever been prescribed Namenda by Dr. Rachman. Medical records

4

revealed Dr. Rachman had prescribed Mark Shapiro Namenda in 2010, and Nonna's refills had been regularly authorized by Dr. Rachman since 2010. Further, medical records and PBM statements also listed a drug named Aricept, which is similarly used to treat memory loss in older adults, which was never disputed by the Shapiros.

Nonna's testimony was also internally inconsistent, as she was unable to establish when she became aware she was being billed for Namenda, and what actions she took to remedy the alleged error. Nonna initially testified that she had never heard of Namenda until her daughter was denied a life insurance policy. Nonna contradicted herself, however, when she testified that she regularly and thoroughly reviewed her statements from Silver Script. When it was pointed out that Namenda appeared on her Silver Script statement every month for roughly seven years before this lawsuit began—Nonna testified that she had noticed the Namenda billing sometime in 2014–15. Nonna was inconsistent in her testimony of who she contacted to sort out the allegedly erroneous billing of Namenda, and when or if she had informed her daughter of the problem before 2017. At first, Nonna claimed she contacted Silver Script about being billed for Namenda, but later testified she had actually contacted Fairfax. Initially, she testified that she contacted someone in 2014, when she first discovered the error, but later testified that did not contact anyone about Namenda until 2017, when her daughter was denied the life insurance policy.

Nonna Shapiro's testimony also contradicted Anna Shapiro's testimony—where Anna testified that Nonna did not tell her about Namenda until the insurance was denied in 2017. Further, Fairfax produced prescription records from Dr. Rachman that showed Nonna had been prescribed Namenda for many years, and Dr. Rachman's deposition testimony was consistent with those records. Accordingly, the Court cannot credit Nonna's testimony that she never received Namenda from Fairfax.

3. Anna Shapiro

Anna Shapiro testified that she handles a large range of domestic tasks for her Parents, including sorting their prescriptions and placing them in front of both of her parents twice a day to take with meals. She testified that although she would not receive the prescription bag from Fairfax, she would open it and sort her parents' medications to be administered later. She

testified that she was involved in every aspect of her Parents' care—spending forty or more hours per week at their home assisting them. However, despite her Parents' difficulty with English, Anna Shapiro testified that she did not assist her Parents with financial or medical bills or statements. Anna further testified that Dr. Rachman would see her Parents roughly once every two months from 2010–17, which would equate to roughly forty visits in the span of seven years. Anna Shapiro testified that she rarely (if ever) accompanied her Parents into the doctor's office. Anna could not remember ever interacting with Dr. Rachman. Instead, Anna would wait outside the office or drive around and complete other errands for the roughly two hours her Parents would spend at Dr. Rachman's office. Anna also said she had no interaction with Fairfax Pharmacy—her Parent's exclusive prescription provider for over ten years—until immediately before this lawsuit. This lack of interest in her Parent's medical providers is inconsistent with Anna's testimony that she was closely involved in every aspect of their care.

Anna's testimony also contained other inconsistencies which weigh against her credibility. Anna testified that her mother spent several months at Anna's home immobilized with a broken ankle, during which time Nonna received prescription deliveries from Fairfax (the Shapiros' only pharmacy). But Anna testified that she never interacted with anyone from Fairfax, including delivery drivers, until 2017. Contrarily, Yuri Bon testified he delivered prescription directly to Anna's home while Nonna was recovering from her broken ankle. There was also inconsistency about Fairfax's regular deliveries to the Parents' home. Anna testified that her Parents ate dinner around 6pm, when she would set out medication for her Parents to take, and the Fairfax deliveries would occur after she left around 7pm. However, Mark testified that he and his wife would sometimes eat dinner around 8pm, after the Fairfax deliveries had come. It is not clear, between these two accounts, when Anna gave the medications to the parents. Anna's sworn declaration also stated that neither Parent had ever been prescribed Namenda by Dr. Rachman, which was contradicted by Dr. Rachman's medical records. Overall, Anna Shapiro could not give a full, consistent, and accurate account of her Parents' medical history. The Court therefore cannot credit Anna Shapiro's testimony that Namenda was never delivered to her Parents.

B.  **Defendant's Documentary Evidence**

Anna contends the Court should draw a negative inference from the Defendant's destruction of inventory records during the relevant time period while the operative complaint was pending. This complaint was dismissed and refiled several times, and Defendant testified that, as a part of its regular business practice, it continued to destroy its inventory records on rolling basis for the previous 36 months. The operative complaint which produced this trial was filed on May 29, 2019—which, by Defendant's testimony of regular business practices, would mean Defendant had not already destroyed records beginning May 1, 2016. It is not clear if Defendant knew another complaint was coming after the dismissal of the First Amended complaint, or if Defendant had been instructed by either side to preserve its records before the filing of the final complaint. As described earlier, the case had been filed and dismissed twice before discovery opened.[1] Defendant testified it continued to destroy those records, but there was no evidence that Defendant did so to intentionally avoid production in this lawsuit.

Even if the Court draws a negative inference from the destruction of those records which should have been preserved, the inference is of limited probative value. The alleged fraud took place over the course of about seven years, from late 2010 to early 2017, and the missing records would only account for less than one year of that period. Even if that limited window did uncover some impropriety by Defendant, it is unlikely the discrepancy would be very probative to Anna's claim. The destroyed records would only show the amount of Namenda ordered or in-stock versus that which was dispersed—there would be no way to know if any gap in the accounting would necessarily apply to the Shapiros.[2]

---

[1] It is not clear to the Court if Defendant did or did not have a duty to preserve its records between the dismissal of the First Amended Complaint and the filing of the operative Second Amended Complaint. *Compare Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (internal quotation marks omitted) ("A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed.") *with U.S. v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (when a health care provider receives a "clean bill of health" following an investigation, destruction of records in the normal course of business is not spoliation).

[2] The record of Defendant's previous settlement with the California State Board of Pharmacy is similarly unhelpful. The settlement did not require an admission of guilt, and Defendant testified

7

### C. Alleged Conspiracy with Dr. Rachman

Finally, even if they concede that Namenda was actually ordered by Dr. Rachman, Anna implies that a conspiracy existed between Dr. Rachman and Fairfax Pharmacy. In this alleged conspiracy, Fairfax would send unneeded refill requests for Namenda to Dr. Rachman, who would then summarily authorize the refill. Having received the authorization, Fairfax would then bill Medicare and the patient for Namenda but never disperse or deliver it. Anna has failed to provide any credible evidence of such a conspiracy. Anna did not provide any evidence that Dr. Rachman benefited from authorizing refills of Namenda. To the contrary, Dr. Rachman testified in deposition that he never paid or received any kind of kickback for prescriptions or referrals. Dr. Rachman also testified that he did authorize the Namenda refills, and Fairfax's records are consistent with his own to the extent he was able to compare them.

There is also limited value in perpetrating a fraud in which Defendant decides to consistently not disperse a single, physician-authorized medication. The total amount billed to Medicare for the Shapiros' Namenda was roughly $36,000 over the course of seven years. The value of Namenda appears to be several hundred dollar per bottle. It seems unlikely Fairfax would attempt to defraud the government, knowing the tremendous penalties that could follow and constant risk of spontaneous audit, for a little over $5,000 per year. This type of scheme might be reasonably inferred if the same pattern were repeated multiple patients or across multiple medications, but, again, there was no evidence of such a scheme. Of the dozen or so medications the Shapiros received ever month for seven years, there was no evidence that other medications were ever withheld by Fairfax. There is no indication that any of Fairfax's other patients did not receive Namenda (or any other prescription) when it was ordered by a doctor. On this record, the Court cannot reasonably infer any conspiracy without engaging in pure speculation.

---

the settlement was reached because of financial considerations. The alleged violation also did not specifically relate to Namenda or the Shapiros. The administrative settlement is not proper impeachment evidence under Federal Rule of Evidence 609, and nor is it especially probative of truthfulness under Federal Rule 608. Aside from the minimal evidence provided through the

8

### D. Defendant's Evidence

Defendant provided declarations and in-court testimony from Boris Gorokhovsky, Fairfax Pharmacy's owner, and Yuri Bon, a delivery driver for Fairfax during the relevant time period. The parties also stipulated to the admission of Dr. Rachman's deposition testimony, which the Court fully considered. Although Defendant's witnesses remained essentially unimpeached, they also were not able to competently address the essentially issue in the case—if the Namenda was actually delivered to the Parents.

Gorokhovsky testified to Fairfax's general business practices and introduced Fairfax's business records as their custodian and person most competent to authenticate them. Although Anna attempted to impeach Gorokhovsky regarding his handling of Fairfax's previous settlement with the California State Board of Pharmacy, his testimony regarding the settlement was inconclusive and mostly collateral (as described above). Importantly, it was undisputed that Gorokhovsky never spoke with any of the Shapiros before 2017—nor did he have any direct role in filling their prescriptions. Gorokhovsky owns Fairfax, but he is not a pharmacist. He testified that he never directly filled any patients' prescriptions, nor did he place medicines into delivery bags for the delivery drivers. Anna did not call any witness responsible for actually filling the Parents' prescriptions, nor did she introduce evidence that Fairfax's prescription filling process was somehow deficient.

Yuri Bon, the delivery driver, also testified that he did not fill prescriptions or have any input into what went into the delivery bags. As described above, Bon testified that his job was solely to take the stapled-shut-bag from the pharmacy counter and deliver it to the patient's door—which he undisputedly did for the Shapiros many times. The bag would have a page attached that included the label of every prescription that was supposed to be in the bag. Bon was not able to testify as to what actually went into the bag, nor was he able to say what the Shapiros actually received. It was undisputed, however, that Bon delivered every other prescription listed on the bag, except Namenda, on multiple occasions throughout the years Fairfax served the

---

settlement document, there was no evidence introduced to establish the circumstances surrounding the alleged fraud.

9

Shapiros. Bon testified that Mark Shapiro usually received the bag of prescriptions, and that Mark never signed when he picked them up. Bon testified that he most likely printed the Shapiros' signatures on the delivery bag himself to verify delivery because neither of the Parents would ever sign for them. However, as discussed above, Mark's signature would have been of little value, as he was unable to read the delivery receipt of the labels of the drugs he actually received. Ultimately, neither Bon nor Gorokhovsky added testimony that was especially probative of Anna's fraud claims.

Finally, as discussed above, Dr. Rachman testified via deposition that he did authorize refills of Namenda for both of the Parents. Although Dr. Rachman was unclear about the origin of the Namenda prescription for either of the Parents, he asserted that his continued prescription of Namenda to both of the Parents was consistent with his practice of medicine.

### III. Conclusions of Law

#### A. False Claims Act

Anna brings her claim as a qui tam relator under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging Fairfax fraudulently billed the United States for Namenda which was never delivered. Under the FCA, if a defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States, they may be liable "for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C.A. § 3729. Under the FCA, "knowingly" means a defendant:

> (i) has actual knowledge of the information;
> 
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> 
> (iii) acts in reckless disregard of the truth or falsity of the information

*Id.* § 3729(b)(1)(A)(i)–(iii). But the FCA "require[s] no proof of specific intent to defraud." *Id.* § 3729(b)(1)(B). Anna is "required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." *Id.* § 3731(d).

B. Analysis

In this case, Anna alleges Defendant knowingly billed Medicare for prescription Namenda that Defendant knew was never delivered. Based on the analysis of the evidence provided above, the Court concludes that Anna has failed to prove by a preponderance of the evidence that the Namenda was not delivered to the Shapiros. Anna has also failed to establish that, even if the Namenda was not delivered to the Shapiros, Defendant failed to deliver it knowingly. Based on the inconsistencies explained above, Anna's testimony regarding the failure to delivery Namenda is deemed not credible. Contrarily, Defendant's evidence establishes a general business practice wherein prescriptions that are ordered by physicians are delivered to the patients. Without supporting evidence, it seems unlikely Defendant would consistently withhold the Shapiros' duly prescribed Namenda for seven years while routinely delivering a dozen other prescriptions every month. Anna has failed to meet its burden to establish that the Namenda which Dr. Rachman orders and Fairfax billed was not actually delivered to the Shapiros. Defendant has therefore not violated the FCA. All of the circumstantial evidence in this case weighs in favor of Defendant's contention that it disbursed the Namenda, like it would any other drug, to the Shapiros.

IV. Conclusion

Based on the Court's findings of fact and conclusions of law set forth above, the Court holds Anna has failed to establish the elements of the False Claims Act by a preponderance of the evidence. The Court therefore finds in favor of the Defendant.

IT IS SO ORDERED.

Date: 2/25/20

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE